IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23-CR-87-TAV-JEM |
| | ) | |
| TARIUS S. MYERS, SR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on Defendant Tarius Myers's Motion to Suppress All Evidence Following May 10, 2022 Traffic Stop [Doc. 56]. *See* 28 U.S.C. § 636(b). The Indictment charges Defendant Myers, three named codefendants, and unnamed others with conspiring to distribute fentanyl (Count One) [Doc. 3 p. 1]. It also charges Defendant Myers, Codefendant Alison Grace, and an unnamed person with conspiring to distribute methamphetamine (Count Two) and fentanyl (Count Three) [*Id*. at 2–3]. Finally, it charges Defendants Myers and Grace with possessing a firearm in furtherance of drug trafficking (Count Four) [*Id*. at 3]. All four counts allegedly occurred between May 1 and 20, 2022 [*Id*. at 1–3]. These charges arise in part out of the stop and search of a vehicle in which Defendant was a passenger on May 10, 2022. Defendant moves to suppress all evidence flowing from his May 10, 2022 arrest, arguing that his seizure and arrest violated his rights under the Fourth Amendment [Doc. 56 pp. 2–3; Doc. 72 pp. 1–2].

On May 10, 2022, the Sevier County Sheriff's Office ("SCSO") received an anonymous written tip regarding an armed individual with illegal drugs at the Park Vista Hotel. The author of the tip reported that he knocked on the door of a neighboring room to speak to the occupants about their noise level, and a heavy-set white female opened the door. The tip's author reported

that from the door beyond the female, he saw a black male with dyed dreadlocks wearing a firearm and removing bags of a tan powder from a portable safe. The tip's author identified the noisy neighbors as driving a white Jeep Compass. Later that morning, officers surveilling the hotel observed a white female and a black male with blonde braids leave the hotel with their luggage, enter a white Jeep Compass, and depart the hotel parking lot. Officers conducted a traffic stop on the Jeep. They surrounded it with their vehicles, then ordered the occupants out at gunpoint and handcuffed them. A drug detection dog alerted on the vehicle. A search of the vehicle yielded a portable safe containing $4,126 in cash, a loaded handgun, and bags of suspected fentanyl. The male passenger, identified as Tarius Myers, had $1,933 on his person.

Defendant Myers argues the officers lacked probable cause or reasonable suspicion to stop the vehicle and that his detention at gunpoint and in handcuffs immediately following the stop amounted to an arrest without probable cause [*Id*.]. He asserts that all evidence seized from the Jeep must be suppressed as the fruit of his unconstitutional seizure and arrest [*Id*.].

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned finds the officers had probable cause to conduct a traffic stop after witnessing a traffic violation. The undersigned also finds that Defendant's detention in handcuffs amounted to an illegal arrest because the level of force used to detain Defendant was not reasonably related to the traffic stop, nor did the officers have reasonable suspicion to believe that Defendant was armed and dangerous. Finally, the undersigned concludes that the currency seized from Defendant's person should be suppressed as the fruit of his illegal arrest. But the evidence seized from the vehicle should not be suppressed because it was seized independently of Defendant's arrest. The undersigned therefore recommends the District Judge **GRANT in part** Defendant's motion to suppress [Doc. 56].

# I.     SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on February 27, 2024, for an evidentiary hearing on Defendant's motion to suppress. Assistant United States Attorney Brent Nelson Jones appeared on behalf of the Government. Attorney Jonathan D. Cooper represented Defendant Myers, who was also present.

The Government presented the testimony of Federal Bureau of Investigation ("FBI") Task Force Officer Steffan Hollifield ("TFO Hollifield"), who testified that in addition to his position as an FBI task force officer, he is a lieutenant in the SCSO Narcotics, Organized Violent Crime, Apprehension ("NOVA") unit, where he has worked since June 2019 [Doc. 68 p. 7–8, 11]. He has worked as an FBI task force officer since 2020 [*Id*. at 8]. TFO Hollingfield has worked in law enforcement since August 2016, previously serving as a patrol officer and a detective on general assignment [*Id*.].

TFO Hollifield stated that in the early morning of May 10, 2022, the SCSO received an anonymous tip about drugs and firearms on its website [*Id*. at 9]. TFO Hollingfield described the tip as follows: The author of the tip stated he was staying at the Park Vista hotel and had complained to hotel staff about noise in the room next door [*Id*.]. The author said he later knocked on the door of the neighboring room, and when the door was opened, he observed narcotics and weapons inside that room [*Id*.]. The author described the occupants of the neighboring room as a white female, who was about five feet, eight inches tall and "chunky," and a black male with dyed dreadlocks extending to his shoulders [*Id*. at 10]. The author said the occupants of the neighboring room were driving a white Jeep Compass and a gray Toyota Camry [*Id*. at 10–11]. The author gave his name in the tip but did not leave a telephone number [*Id*.at 9–10].

TFO Hollifield said upon receiving the tip, he and other members of the NOVA Unit discussed the tip and planned to go to the Park Vista hotel to locate the vehicle mentioned in the tip and to establish surveillance on that vehicle [*Id.* at 11–12]. Five officers, including TFO Hollifield, went to the hotel to begin surveillance [*Id.* at 12]. Two officers were positioned in the hotel parking lot, and the others were located "down the road" [*Id.*]. TFO Hollifield said the hotel is on top of a hill and that he was parked on the street where he could observe the hotel's entrance and exit [*Id.* at 14]. He stated that the officers conducting surveillance communicated over a private radio channel, which is not monitored by the dispatcher or recorded [*Id.* at 12]. TFO Hollifield stated that they use the private channel to avoid tying up the main channel with the high volume of communications typically made during surveillance [*Id.* at 12–13]. He said the surveilling officers were in constant communication with each other over the private channel, keeping each other informed about what was occurring [*Id.* at 16].

TFO Hollifield testified that one of the officers in the hotel parking lot radioed that people walking toward the white Jeep Compass matched the description from the tip [*Id.*]. He said the officer radioed that the people entered the Jeep Compass and departed the parking lot heading down the hill [*Id.*]. TFO Hollifield said he then saw the Jeep Compass leave from the hotel's entrance [*Id.*]. He said having corroborated that the individuals and vehicle matched the tip, he and other officers began following the Jeep Compass to further observe the vehicle and "to try to develop probable cause for a traffic stop" [*Id.* at 17]. TFO Hollifield said he followed the Jeep Compass from the hotel to Wears Valley Road at the third traffic light in Pigeon Forge [*Id.* at 18]. He stated that while following the vehicle, he saw it traveling at forty-nine miles per hour in a thirty-five-mile-per-hour zone between the third and tenth traffic lights [*Id.*]. He said he

4

radioed that the Jeep Compass was speeding to the other surveilling officers and to some patrol officers [*Id*. at 19–20].

TFO Hollifield stated that a marked patrol unit was radioed to stop the vehicle so that he could maintain his undercover status and for officer safety [*Id*. at 19]. None of the undercover officers had body cameras, but Sergeant Bart Tyner in the marked patrol unit had a body camera [*Id*. at 19–21]. TFO Hollifield said Sergeant Tyner stopped the Jeep Compass, and he and undercover Officer Bruce Belitz assisted [*Id.* at 21]. He stated that Defendant Myers was in the front passenger seat of the vehicle [*Id*. at 22]. TFO Hollifield said that based upon the report of narcotics from the tip, K-9 Officer Timothy Marlow was present to deploy his drug detection dog [*Id*.]. TFO Hollifield said after an alert by the drug dog, the officers searched the vehicle and seized heroin, fentanyl, cash, and a weapon [*Id*. at 21–22].

On cross-examination, TFO Hollifield testified that tip was submitted on the SCSO website and then routed to the NOVA unit [*Id*. at 23]. He identified an email containing the tip and stated that the website automatically emailed the tip to him and others shortly before 7:00 a.m. on May 10 [*Id*. at 24–25].[1] He agreed that he received the tip around 7:00 a.m. and that the person who provided the tip identified himself as Bob Turner [*Id*. at 25]. TFO Hollifield acknowledged that he did not know if the individual gave his actual name, nor did he know Bob Turner [*Id*. at 25–26]. He said that the individual did not provide a telephone number or email address [*Id*. at 26]. He agreed that the reliability of the tip was not apparent from either the identity of the author or the contents of the tip and, thus, he and the other officers sought to corroborate the tip [*Id*. at 27].

---

[1] A copy of the email containing the tip is provided as an attachment to the Government's response [Doc. 62-1].

According to TFO Hollifield, the author of the tip selected that he was reporting about "suspicious activity" and "drugs" in room number 1314 at the Park Vista hotel [*Id*. at 26–27]. TFO Hollifield agreed that room 1314 is on the thirteenth floor of the hotel [*Id*. at 27]. He stated that the tip describes the two occupants of room 1314 and states that the author is their neighbor [*Id*. at 28]. The author reported complaining to the hotel staff of loud noise several times, but the hotel staff took no action [*Id*.]. TFO Hollifield stated that the author reported knocking on the door to attempt to talk with the occupants in room 1314 and that a female opened the door allowing him to see inside the room [*Id*.]. He said the author reported hearing people coming and going from room 1314 and seeing a bag of tan powder and a weapon inside the room [*Id*. at 32].

TFO Hollifield said he and the other members of NOVA unit arrived at the SCSO around 8:00 a.m. and discussed the tip [*Id*. at 29]. After confirming that everyone had reviewed the tip, the officers planned to go to the Park Vista hotel to try to corroborate information from the tip [*Id*.]. He agreed that the contents of the tip were "very specific" [*Id*.]. TFO Hollifield said he did not find it odd that the female opened the door to her hotel room despite drugs and guns being in view or that the author was able to identify two cars driven by the occupants of the room [*Id*. at 29–30]. He said that he was familiar with the parking lot at the Park Vista hotel, which is a single, "open-air" lot with additional parking spots on the side [*Id*. at 30]. TFO Hollifield said he did not know if the author followed the occupants of room 1314 to their cars but agreed that the author identified two cars from the parking lot as associated with the occupants of that room [*Id*. at 31]. He agreed that the author could have been an associate of the occupants of the room with "an axe to grind" [*Id*.]. He agreed that the tip did not state that the drugs would be taken from the room and placed into a vehicle, nor did it state any future activity [*Id*. at 33].

6

TFO Hollifield said the officers arrived at the Park Vista around 9:00 or 9:30 a.m. [*Id.* at 34]. He stated they went to the Park Vista to conduct surveillance to corroborate the vehicles described in the tip and whether the individuals described in the tip entered those vehicles [*Id.* at 40]. Neither he, nor anyone on the NOVA team, made notes, reports, video, or photographs of the surveillance at the Park Vista [*Id.* at 34]. Although TFO Hollifield later filled out FBI 302 reports in this case, he stated that this case started as a local SCSO investigation, not an FBI investigation [*Id.* at 36].

TFO Hollifield testified that Levi Morton was the supervisor of NOVA in May 2022 and was present with the team conducting surveillance at the hotel [*Id.* at 38]. Two officers were located at the top of the hill in the hotel parking lot, but TFO Hollifield could not recall which officers were in the parking lot [*Id.* at 38–39]. TFO Hollifield agreed that the hotel parking lot is accessed by a narrow, two-lane driveway from the street and that the driveway is curvy and one to two tenths of a mile long [*Id.*]. He said he was located at the bottom of the Park Vista driveway near a stop sign where the driveway intersects with the Parkway [*Id.* at 39, 80–81]. He agreed that he had a good view of vehicles traveling from the hotel to the road [*Id.* at 39].

TFO Hollifield stated that he did not apply for a search warrant for room 1314 before conducting surveillance because he did not believe he had probable cause [*Id.* at 40]. He did not recall any radio communications regarding a member of NOVA team checking with hotel management to determine whether an individual named Bob Turner was a guest at the hotel or whether there were noise complaints about room 1314 [*Id.* at 41]. He agreed that he did not know if the tip's author was a guest at the hotel or if the individuals ultimately arrested were guests in room 1314 [*Id.* at 42]. TFO Hollifield confirmed that a member of NOVA team did not knock on the door of room 1314 [*Id.* at 43]. He said the two vehicles described in the tip were a

7

white Jeep Compass and a black Toyota[2] with tinted windows [*Id*. at 43–44]. TFO Hollifield said the officers saw a black Toyota with dark tinted windows leave the hotel before 9:30 a.m. but did not see who entered the vehicle [*Id*. at 44]. Officers followed the Toyota, which fled when they attempted to conduct a traffic stop [*Id*.].

TFO Hollifield said the officers stationed in the parking lot radioed that they saw a male and female, who appeared to fit the description of the male and female in the tip, leave the hotel [*Id*. at 45]. He agreed that the surveilling officers did not know the identities of these two people, nor whether they had stayed in room 1314 [*Id*.]. TFO Hollifield stated that the observing officers radioed that the male and female were carrying luggage [*Id*. at 46]. The officers in the parking lot saw the Jeep leave the parking lot and head down the hill [*Id*.]. TFO Hollifield said a member of NOVA team had checked with the front desk and learned that the occupants of room 1314 were scheduled to check out that day [*Id*. at 46–47]. He agreed that he did not include this information in his report [*Id*. at 47]. TFO Hollifield thought the man and woman left the hotel around 11:30 a.m.,[3] because checkout is at 11:00 a.m. and the officers stopped the Jeep at noon [*Id*. at 47–48]. He acknowledged that he did not know if the individuals observed entering the Jeep Compass had checked out of their hotel room [*Id*. at 48].

TFO Hollifield testified that after observing the Jeep drive down the hill, he followed directly behind it in his white GMC pickup truck [*Id*.]. He estimated that six or seven law enforcement officers, including two patrol officers–Sergeant Tyner and K-9 Officer Marlow–

---

[2]    Although TFO Hollifield testified on direct examination that the Toyota Camry was gray, he clarified on cross-examination that the tip reported a black Toyota Camry, which is what the officers observed leaving the Park Vista [Doc. 68 pp. 43–44].

[3]    Although TFO Hollifield initially testified that the man and woman meeting the description in the tip left the hotel at "11:30 p.m.," the context of this testimony reveals that the time was 11:30 a.m. [Doc. 68 pp. 47–48].

were also following or monitoring the Jeep [*Id.* at 49]. TFO Hollifield agreed that no recordings exist of the communications on the private channel except parts of conversations captured on the uniformed officers' body cameras [*Id.* at 50]. He stated that he reviewed the video recordings from the body cameras of Officer Marlow and Sergeant Tyner in preparation for his testimony [*Id.* at 50–51].

TFO Hollifield said he "paced" the Jeep, observed it speeding, and communicated that traffic violation to the other officers [*Id.* at 51–52]. He thought this communication was not captured on the uniformed officers' body cameras because officers activate their body cameras just before they deal with a member of the public and the recordings typically go back only a short amount of time before activation [*Id.* at 52]. TFO Hollifield stated that as he followed the Jeep, Sergeant Tyner was in the vicinity but not within view of the Jeep [*Id.* at 53]. Defense counsel played the video recording from Sergeant Tyner's body camera [Exh. 2], and TFO Hollifield agreed that at the start of the recording, he can be heard radioing the team that the white Jeep Compass moved into the right-most lane [Doc. 68 p. 55; Exh. 2 at 11:59:50–52]. He agreed that he did not mention speeding or "going left of the center lane" at this time [Doc. 68 p. 55]. He stated that he later communicated with the other officers about their positions for the traffic stop [Doc. 68 p. 57; Exh. 2 at 12:00:18–12:01:38]. TFO Hollifield stated that he and the other officers followed the Jeep to monitor for a traffic violation and that once they observed a traffic violation, they planned to stop the Jeep at a favorable spot [Doc. 68 p. 62].

TFO Hollifield agreed that the stop of the Jeep was not a typical traffic stop [*Id.*]. He said the Jeep was boxed in with a curb and sidewalk to the right, Officer Bruce Belitz in front of the Jeep, his truck to the left, Sergeant Tyner behind the Jeep, and Officer Marlow behind Sergeant Tyner [*Id.* at 60–63; Exh. 2 at 12:01:48]. Officer Belitz was in an unmarked pickup truck with

9

blue lights in the rear window [Doc. 68 pp. 63–64]. TFO Hollifield stated that his supervisor Officer Morton was directly behind him [*Id*. at 64]. He said they stopped the Jeep in this way to prevent its flight and a police pursuit [*Id*.]. TFO Hollifield agreed that the team stopped the Jeep approximately two minutes into Sergeant Tyner's body camera video [*Id*. at 65; Exh. 2 at 12:01:48]. He also agreed that during the two minutes before the stop, none of the officers were recorded on the video saying the Jeep was speeding or had crossed left of center [Doc. 68 p. 65].

TFO Hollifield agreed that his truck was not equipped with radar equipment or a dash camera and that he was not wearing a body camera [*Id*.]. He stated that on Sergeant Tyner's body camera video, Sergeant Tyner can be heard telling the Jeep's driver that she was stopped for speeding and for going forty-nine miles per hour in a thirty-five-mile-per-hour zone [*Id*. at 66; Exh. 2 at 12:04:12–20]. TFO Hollifield said Sergeant Tyner knew the reason for the stop and the Jeep's speed because he (TFO Hollifield) radioed that information before the body camera video began [Doc. 68 pp. 66–67]. He reiterated that he stopped the Jeep because he observed it speeding [*Id*. at 67]. He agreed that after stopping the Jeep, the officers' task was to identify the driver and to check her driver's license, insurance, and registration [*Id*. at 67–68].

TFO Hollifield stated that within one minute of stopping the Jeep, he, Sergeant Tyner, Officer Morton, and Officer Marlow surrounded the Jeep with their guns drawn [*Id*. at 69–70, 72–74; Exh. 1; Exh. 2 at 12:02:00]. He said he was holding his gun in "a low ready position" [Doc. 68 p. 73]. In the video recording, Sergeant Tyner, who was standing with his gun drawn near the rear bumper on the passenger side, ordered the front passenger to put his hands up and then place both hands out of the lowered window [Exh. 2 at 12:2:00–12:02:10]. The passenger, later identified as Defendant Myers, complied, and Sergeant Tyner ordered Defendant to drop the item in his left hand, to place both hands on the door, and not to move [Exh. 2 at 12:02:11–

25]. An undercover officer directed Defendant Myers to get out of the vehicle and handcuffed him [Exh. 2 at 12:02:57–12:03:20]. TFO Hollifield testified that Defendant was removed from the Jeep and handcuffed approximately one and one-half minutes after they stopped the Jeep [Doc. 68 pp. 74–75]. He agreed that after Defendant was handcuffed, Officer Marlow deployed his drug detection dog around the Jeep, and the dog alerted [*Id.*]. The video recording shows that while Officer Marlow deployed his dog and Defendant waited in handcuffs, Sergeant Tyner spoke with the driver, informing her of the reason for the stop; gathering her name, date of birth, and driver's license number; radioing this information to the dispatcher; and preparing to write a citation for speeding [Exh. 2 at 12:04:13–12:06:20].

On redirect examination, TFO Hollifield testified that defense counsel played almost four minutes of Sergeant Tyner's body camera video [Doc. 68 pp. 77–78]. He estimated that the distance between the Park Vista hotel and the location where the officers stopped the Jeep was six miles [*Id.* at 78]. TFO Hollifield stated that based upon watching the video, the body cameras are set to capture two minutes of video prior to being activated [*Id.*].

TFO Hollifield stated that he knew the Jeep Compass was speeding because he paced it [*Id.* at 79]. He said he remembered that the Jeep was speeding, despite two years elapsing and not taking notes [*Id.*]. TFO Hollifield said the officers boxed in the Jeep and approached its occupants with guns drawn to protect both the officers and the occupants because the occupants possibly had a firearm [*Id.* at 79–80].

On recross-examination, TFO Hollifield said he paced the Jeep between traffic lights three and ten on the Parkway, which is the main road through town [*Id.* at 80]. He estimated these seven traffic lights were spread over three and one-half miles [*Id.* at 81]. TFO Hollifield acknowledged that spring is a popular time in that area but said that the road was not "overly

11

crowded" that morning [*Id*.].He did not recall between which lights the speeding occurred [*Id*.]. He agreed that he paced the Jeep by maintaining a constant distance between his truck and the Jeep without accelerating or decelerating [*Id*. at 82]. TFO Hollifield said his truck has an analog speedometer [*Id*. at 83]. He testified that he "assumed" that the speedometer on his truck was calibrated, but he was not certain [*Id*.]. He said he was trained to pace a vehicle for "a reasonable amount of time," rather than for a specific length of time or for a certain distance [*Id*.]. He stated that when he paced the Jeep, he was directly behind it and that the needle on his speedometer remained just under the fifty-mile mark for the entire time he paced the vehicle [*Id*. at 84–85].

TFO Hollifield agreed that he believed the occupants of the Jeep possibly had a firearm based upon the tip [*Id*. at 85]. He said that at the time of the stop, the officers "were leaning toward [the tip] being true" because of the information they had corroborated [*Id*.].

At the conclusion of evidence, the undersigned granted the parties' request to file post-hearing briefs [*Id*. at 89–90]. Defendant filed his post-hearing brief on March 28, 2024 [Doc. 72]. The Government filed its post-hearing brief on April 4, 2024 [Doc. 73]. On April 8, 2024, Defendant filed a reply brief [Doc. 74]. After receiving all evidence and briefs, the undersigned took the motion under advisement.

## II.  FINDINGS OF FACT

Around 7:00 a.m. on May 10, 2022, TFO Steffan Hollifield of the SCSO NOVA unit received a tip submitted on the SCSO's website by an individual purportedly staying at the Park Vista hotel. The author, who gave a name but did not provide a telephone number or other contact information, reported that the occupants of room 1314, which was the room next to his, had multiple visitors and were noisy. He related that after complaining about the noise to hotel staff to no avail, he knocked on the door of room 1314 to talk to the occupants. According to the

tip, a heavy-set white female answered the door, and the author could see a tall black male with shoulder-length dyed dreadlocks sitting at the desk inside the room. The author reported that the black male was armed and removing bags containing a tan powder from a portable safe. The author further reported that the occupants of room 1314 had a white Jeep Compass and a black Toyota Camry with dark-tinted windows.

In response to the tip, TFO Hollifield and four other officers from the NOVA unit arrived at the Park Vista hotel around 9:00 or 9:30 a.m. to conduct surveillance. Two officers were positioned in the hotel parking lot, where they observed a black Toyota Camry and a white Jeep Compass. Officer Hollifield was stationed at the bottom of the hill where the Park Vista's driveway connects to the Parkway, and two other officers were positioned further down the Parkway. The officers communicated over a private radio channel that was not recorded. The officers observed the black Toyota Camry leave the hotel parking lot and attempted to stop it, but the Camry fled. The officers determined that the occupants of room 1314 were scheduled to check out that day and that checkout time was 11:00 a.m. Around 11:30 a.m., officers in the parking lot observed a white female and a black male with shoulder-length blonde braids leave the hotel carrying luggage, enter the Jeep Compass, and leave the parking lot.

TFO Hollifield, who was in an unmarked pickup truck, followed the Jeep on the Parkway for three and one-half miles through seven traffic lights. During this time, he paced the Jeep and determined it was traveling at forty-nine miles per hour in a thirty-five-mile-per-hour zone. TFO Hollifield radioed the other officers on the private channel that the Jeep was speeding and that it was going forty-nine miles per hour. TFO Hollifield and several other undercover officers followed the Jeep onto Wears Valley Road while Sergeant Bart Tyner and K-9 Officer Timothy Marlow traveled behind them but out of view in marked patrol cars. The officers coordinated the

stop of the Jeep over the private radio channel. Around noon, the officers stopped the Jeep by boxing it against the curb with undercover officers in front and to the left of the Jeep and Sergeant Tyner in a marked patrol car behind the Jeep.

Four officers surrounded the Jeep with their guns drawn. Sergeant Tyner instructed Defendant, who was in the front passenger seat, to place his hands outside the open window against the door. Defendant was removed from the Jeep and handcuffed within one and one-half minutes of the stop. After the occupants[4] were out of the Jeep, Sergeant Tyner informed the driver that they stopped her for traveling at forty-nine miles per hour in a thirty-five-mile-per-hour zone. Sergeant Tyner then gathered the driver's name, birthdate, and driver's license number and radioed this information to the dispatcher. While Sergeant Tyner spoke with the driver and Defendant stood on the sidewalk in handcuffs with another officer, Officer Marlow deployed his drug detection dog around the Jeep, and the dog alerted. An officer frisked Defendant, removed a large roll of currency from Defendant's pocket, and then placed Defendant in the back of a patrol car. The officers searched the Jeep and seized narcotics, currency, a portable safe, scales, and a handgun from the vehicle.

## III.    ANALYSIS

The Fourth Amendment protects citizens from unreasonable searches or seizures. U.S. Const. amend IV. Defendant Myers argues that law enforcement violated his rights under the Fourth Amendment because the officers lacked probable cause or reasonable suspicion to stop the vehicle in which he was a passenger. He also contends that his detention on the scene exceeded the scope of a traffic stop and constituted an arrest without probable cause. He asks the

---

[4]    Sergeant Tyner's body camera video and Officer Marlow's police report reveal that in addition to the female driver and Defendant, the Jeep contained a female passenger in the back seat [*See* Exh. 2 & Doc. 62-2 p. 3]. The officers also removed the female passenger from the Jeep, handcuffed her, and ultimately arrested and charged her [*Id.*].

14

Court to suppress the evidence seized from the vehicle and his person as the fruit of his unconstitutional seizure and arrest.

For the reasons set forth below, the undersigned finds officers properly stopped the vehicle in which Defendant was riding for a traffic violation. Defendant's removal from the vehicle at gunpoint and restraint in handcuffs, however, amounted to an arrest without probable cause. But only the currency seized from Defendant's person should be suppressed because the evidence seized from the vehicle is not the fruit of Defendant's illegal arrest.

## A.    Stop of the Jeep

Defendant argues that law enforcement lacked probable cause or reasonable suspicion to stop the vehicle in which he was a passenger [Doc. 56 pp. 2–3; Doc. 72 pp. 1–2, 6–8]. He contends that TFO Hollifield's testimony that the Jeep was speeding is not credible [Doc. 72 pp. 7–8, 18–19], and that the anonymous tip did not provide reasonable suspicion for an investigatory stop of the Jeep [Doc. 56 p. 3; *see* Doc. 72 pp. 2–6; Doc. 74 p. 1]. As explained below, the undersigned finds that the officers lacked reasonable suspicion to conduct an investigative stop of the Jeep but had probable cause to stop the Jeep for a traffic violation.

### 1.    Reasonable Suspicion

The Government asserts that the officers had reasonable suspicion to stop the Jeep to investigate possible drug trafficking based upon their corroboration that the occupants of the Jeep matched the description of the individuals described in the tip [Doc. 62 p. 3]. Defendant argues the anonymous tip could not justify an investigatory stop because the tip was unreliable, it provided no predictive information, and the officers did not corroborate any illegal activity [Doc. 72 pp. 3–6, 13–17].

Law enforcement may temporarily seize a person or vehicle and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts which the officer knew at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("It is well settled that the *Terry* doctrine applies to investigative stops of a moving automobile." (citations omitted)). Reasonable suspicion is a quantum of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). Courts evaluate the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. A seizure, however brief, that lacks reasonable suspicion contravenes the Fourth Amendment. *United States v. Jones*, 562 F.3d 768, 773 (6th Cir. 2009).

"A tip—anonymous or not—may furnish reasonable suspicion necessary to justify an investigatory stop." *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019) (citations omitted)); *Williams v. Leatherwood*, 258 F. App'x 817, 821 (6th Cir. 2007) ("Reasonable suspicion need not arise from an officer's own observations; rather, it may arise from informant tips and dispatcher information." (citation omitted)). In assessing reasonable suspicion, courts consider the veracity, reliability, and basis of knowledge of the individual providing the tip; whether law enforcement corroborated the tip; and whether the tip is by a known individual or is

anonymous. *Keeling*, 783 F. App'x at 521 (citations omitted). Moreover, the tip must "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *United States v. Farrington*, 795 F. App'x 404, 408 (6th Cir. 2019) (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)). Courts consider all these factors as a part of the totality of the circumstances known to the officers at the time of the stop. *Keeling*, 783 F. App'x at 521.

The undersigned treats the tip in this case as an anonymous tip. *See Smith*, 2021 WL 5771219, at *9–11 (finding tips by 911 callers with recorded phone numbers and whose report of shots fired was also heard by officers to be reliable but other 911 callers with blocked numbers who only gave a description of individuals running from the scene were not). Although the author gave his name, the officers had no way to contact or locate him.

An anonymous tip is sufficiently reliable if law enforcement can "easily ascertain[]" the informant's identity. *United States v. Jackson*, 700 F. App'x 411, 414–15 (6th Cir. 2017) (concluding tip from unnamed neighbor was reliable because the police knew her address and appearance). "An informant's identity may be easily ascertainable if the police know the informant's telephone number, address, or what the informant looks like." *United States v. Smith*, No. 20-cr-20322, 2021 WL 5771219, at *9 (E.D. Mich. Dec. 6, 2021) (citing *Jackson*, 700 F. App'x at 415). Thus, an unidentified caller to a 911 emergency system can provide reliable information because the system records information about the caller. *Jackson*, 700 F. App'x at 415 (citing *Navarette v. California*, 572 U.S. 393, 400–01 (2014)). "What is important is that the police kn[o]w where to look for the informant and that the informant [i]s aware of this fact." *Id*. (citation omitted).

An anonymous tip may be sufficiently reliable to provide reasonable suspicion for an investigatory stop if "suitably corroborated." *Id*. at *12 (citing *Florida v. J.L.*, 529 U.S. 266, 270

(2000)). Such tips must provide more than a description of the suspect and his or her location. *Id.* at *12–13. The tip must provide some "predictive information" and must allege criminal activity. *Id.* The absence of any predictive information "le[aves] the police without means to test the informant's knowledge or credibility." *J.L.*, 529 U.S. at 271 (holding anonymous tip that a young, black male wearing a plaid shirt and at a certain location possessed a gun did not provide reasonable suspicion to stop defendant). As the United States Supreme Court explained:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 272; *United States v. Atchley*, 474 F.3d 840, 848 (6th Cir. 2007) ("[I]n order to establish the level of suspicion necessary to justify a *Terry* stop, the [anonymous] tip must have sufficient indicia of reliability, *i.e.*, the tip must provide predictive information and a way to test the informant's knowledge or credibility." (citing *J.L.*, 529 U.S. at 270–72)).

The undersigned agrees with Defendant that here the crime tip was insufficient to provide reasonable suspicion to stop the Jeep. The tip provided no predictive information, and law enforcement corroborated only the description of the male and female[5] and the vehicle they were

---

[5]    Defendant argues that TFO Hollifield testified only that he saw a white Jeep Compass leaving the Park Vista driveway and that he did not observe individuals allegedly matching the descriptions from the tip enter the Jeep [Doc. 72 p. 15]. At the evidentiary hearing, defense counsel objected that TFO Hollifield lacked personal knowledge of the individuals leaving the hotel and entering the Jeep [Doc. 68 p. 14–15]. Defendant contends this information is not corroborated by any report or recording [Doc. 72 p. 15]. The Court finds that TFO Hollifield testified that the officers conducting surveillance in the Park Vista parking lot radioed that two individuals meeting the description of the female and male in the tip were getting in the Jeep Compass and leaving the hotel parking lot [Doc. 68 p. 16]. Under the collective knowledge doctrine, TFO Hollifield may rely on information from his fellow officers that is communicated

18

driving. At the time the officers corroborated the description of the individuals and the vehicle, they also knew that the occupants of room 1314 were scheduled to check out that day, that the individuals were observed entering the Jeep Compass with their luggage within thirty minutes of the 11:00 a.m. checkout time, and that the other vehicle the tip associated with room 1314 (the black Toyota Camry) fled when the officers attempted to stop it. These circumstances considered as a whole fail to provide reasonable suspicion to stop the Jeep to investigate drug trafficking. *See id.* (finding officers' observation of four individuals in hotel parking lot standing by a vehicle meeting the description from an anonymous tip that the occupants of a certain hotel room were manufacturing methamphetamine did not without more provide reasonable suspicion because the officers had not corroborated predictive information). Moreover, while the flight of the Camry suggests that the driver wanted to avoid contact with law enforcement, this inference does not provide reasonable suspicion that the occupants of *the Jeep* were engaged in illegal activity. *C.f.*, *United States v. Edwards*, No. 1:11–CR–110, 2011 WL 6934489, *5–7 (S.D. Ohio Dec. 30, 2011) (analyzing cases and observing flight from police can provide reasonable suspicion for a *Terry* stop).

### 2. Probable Cause

The Government asserts that the officers had probable cause to stop the Jeep based upon a traffic violation. [Doc. 62 pp. 3–4; Doc. 73 p. 3]. If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does

---

to him. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). Additionally, TFO Hollifield testified that from his vantage point at the bottom of the hill, he observed the Jeep exit the hotel parking lot at the top of the hill and proceed on the driveway leading down the hill [*Id.* at 16–17]. TFO Hollifield's observation of the Jeep immediately after the officers radioed its departure from the hotel parking lot leaves little doubt it is the same vehicle. Further, the video recording from Sergeant Tyner's body camera corroborates that the female driver and male passenger resemble the individuals described in the tip.

not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993); *see also United States v. Stevenson*, 43 F.4th 641, 644–45 (6th Cir. 2022) (observing that an officer may stop a vehicle based on reasonable suspicion of a completed felony, reasonable suspicion of a misdemeanor in progress, or probable cause of a completed civil traffic infraction). To determine whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment, the Court objectively evaluates the officer's conduct in light of the surrounding circumstances known to the officer. *Ferguson*, 8 F.3d at 388; *see also Whren v. United States*, 517 U.S. 806, 810 (1996). "Probable cause is 'is not a high bar.'" *Stevenson*, 43 F.4th at 645 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Instead, probable cause amounts to "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

TFO Hollifield testified that while traveling directly behind the Jeep on the Parkway, he paced the Jeep by maintaining a constant distance from it and that for the duration of the pacing, his speedometer was just below the fifty-miles-per-hour mark. He stated that he radioed the other officers on the private channel that the Jeep was speeding and was going forty-nine miles per hour in a thirty-five-mile-per-hour zone. Based upon TFO Hollifield's observations, he and the other officers had probable cause to stop the Jeep for speeding. *See United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (holding the "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer).

Defendant challenges the credibility of TFO Hollifield's testimony, arguing that his claim of speeding was merely a pretext for stopping the Jeep [Doc. 72 pp. 7, 19].[6] He asserts that the officer's testimony that the Jeep was speeding is "vague, unreliable, and unbelievable" [*Id*. at 18]. Defendant contends that TFO Hollifield's testimony is vague because he could not pinpoint the location of the pacing, nor state its duration [*Id*. at 7, 18]. He argues the testimony is unreliable because TFO Hollifield could only speculate about whether his speedometer was calibrated and could not give the length of time he paced the Jeep [*Id*.]. He further challenges the credibility of TFO Hollifield's testimony arguing that it is contradicted by Officer Marlow's report, which states that the Jeep was stopped for going fifty-nine in a thirty-five-mile-per-hour zone [*Id*.; Doc. 62-2 p. 8]. Defendant maintains that TFO Hollifield's testimony that he communicated that the Jeep was speeding to the other officers over the radio cannot be corroborated because the private channel was not recorded and this communication by TFO Hollifield was not captured on either body camera recording [Doc. 72 pp. 7, 18–19]. Defendant also argues that the driver of the Jeep was not cited for speeding [*Id*. at 8].

A court may credit a witness's testimony "so long as [it] is facially plausible, internally consistent, and uncontradicted by extrinsic evidence." *United States v. Bowman*, No. 1:21-cr-56-

---

[6]     TFO Hollifield's testimony that he was looking for a reason to stop the Jeep to continue to investigate the tip is irrelevant so long as he had probable cause to believe a traffic violation occurred. *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) ("When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." (citations omitted)); *United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that officer's "motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine its constitutionality" when the officer had probable cause to believe a traffic violation was occurring; *see also United States v. Bowman*, No. 1:21-cr-56-TRM-SKL, 2022 WL 1518251, at *6 (E.D. Tenn. Feb. 11, 2022) ("[T]he fact that law enforcement had other subjective reasons for making the stop is legally irrelevant." (citations omitted)). Defendant acknowledges that pretextual stops are permissible but asks the Court to consider the officers' subjective motivations as an indication that TFO Hollifield invented a reason to stop the Jeep [Doc. 72 p. 19]. As discussed herein, such an inference is contradicted by the proof.

TRM-SKL, 2022 WL 1518251, at *7 (E.D. Tenn. Feb. 11, 2022) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)) (finding officer's testimony that defendant was speeding based upon pacing to be credible), *report and recommendation adopted by* 2022 WL 1117101 (E.D. Tenn. Apr. 14, 2022). TFO Hollifield's testimony that the Jeep was speeding is facially plausible and internally consistent. TFO Hollifield stated that he followed the Jeep on a three and one-half mile stretch of road through seven traffic lights and affirmatively testified that he was able to pace it for a sufficient distance. According to TFO Hollifield, the road was not excessively crowded, which makes the Jeep's speed of forty-nine miles per hour plausible. Additionally, TFO Hollifield testified that the Jeep was traveling at fourteen miles per hour over the speed limit, which gives more weight to his assessment that the Jeep was speeding, despite his uncertainty about whether his speedometer had been calibrated. *See, e.g.*, *United States v. Whaley*, No. 1:04-CR-122, 2005 WL 8168971, *2 (E.D. Tenn. Jan. 11, 2005) (finding probable cause to stop defendant for speeding when officer paced defendant's vehicle, which exceeded the speed limit by fifteen miles per hour, with his unmarked vehicle, the speedometer of which was only "occasionally checked with radar").

Moreover, no testimony contradicts TFO Hollifield's account. *See Bowman*, 2022 WL 1518251, at *6 (observing the uncontradicted testimony of the officer was that the defendant was speeding). Nor did the driver deny that she was speeding when Sergeant Tyner told her the reason for the stop [Exh. 2 at 12:04:17–43]. *See id.* at *7 (observing that the driver did not deny he was speeding when the officer told the driver the reason for the stop). Instead, the driver remarked on the extent of law enforcement's response, not whether the stop was warranted [*See* Exh. 2 at 12:04:17–43 ("All this for speeding?")]. Additionally, Defendant presents no evidence that TFO Hollifield's method of pacing was unreliable. Nothing in the

record contradicts the officer's testimony that pursuant to his training, he must pace a vehicle for a reasonable distance, rather than for a set distance or for a specific amount of time.

TFO Hollifield's testimony that the Jeep was speeding is also corroborated by extrinsic evidence. On the video recording from his body camera, Sergeant Tyner tells the driver that she was stopped for speeding and that she was going forty-nine in a thirty-five-mile-per-hour zone. TFO Hollifield testified that Sergeant Tyner knew the reason for the stop and the Jeep's speed because he radioed that information to the other officers. Officer Marlow's incident report also supports TFO Hollifield's testimony because Officer Marlow gives the basis for the stop as speeding [Doc. 62-2 p. 8]. Although Officer Marlow states in his report that the Jeep was traveling at fifty-nine miles per hour,[7] TFO Hollifield's stated speed of forty-nine miles per hour is more likely given the number of traffic lights on the three and one-half mile stretch.

Finally, although the driver was not cited for speeding, Sergeant Tyner's body camera video shows that before he could write out the citation, the drug detection dog alerted on the Jeep [Exh. 2 at 12:06:35–38]. Upon learning of the dog alert, Sergeant Tyner told the driver he was discontinuing the traffic investigation and focusing his investigation on the dog alert and the Jeep [*Id*.]. *See Bowman*, 2022 WL 1518251, at *7 (observing the officer "credibly explained . . . why he did not complete a warning ticket for the observed traffic infractions once the contraband was discovered"). Sergeant Tyner provided an explanation for why he did not issue a traffic citation.

---

[7]     At the evidentiary hearing, AUSA Jones asked to correct a mistake in the Government's response, explaining that the statement that the Jeep was going fifty-nine miles per hour in a thirty-five-mile-per-hour zone was based upon Officer Marlow's report [Doc. 68 p. 5–6]. AUSA Jones proffered that Officer Marlow would testify that that he mistakenly stated the Jeep's speed in his report and that the speed of the Jeep was forty-nine miles per hour [*Id*.]. Ultimately, after conferring with defense counsel who questioned the relevance of Officer Marlow's testimony, the Government did not present the testimony of Officer Marlow [*Id.* at 87, 89]. The undersigned notes, however, the Government's proffer that both uniformed officers would corroborate TFO Hollifield's testimony on the speed of the Jeep when he paced it.

Thus, the absence of a traffic citation does not detract from the credibility of TFO Hollifield's testimony that the Jeep was speeding.

In sum, while the officers did not have reasonable suspicion to stop the Jeep, the officers had probable cause to stop the Jeep for a traffic violation because TFO Hollifield credibly testified that he observed the Jeep speeding and radioed that observation to the other officers. The initial seizure of the Jeep and consequently of Defendant's person comports with the Fourth Amendment.

### B. Defendant's Detention

Defendant argues that the officers arrested him when they removed him from the vehicle at gunpoint and immediately placed him in handcuffs [Doc. 56 p. 3; Doc. 72 pp. 19–20; Doc. 74 pp. 2–4]. He contends that at this point, which was before the dog sniff and search of the vehicle, officers lacked probable cause to arrest him [*Id.*].

"Fourth Amendment search and seizure analysis unfurls chronologically, and 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Most traffic stops represent a minor inconvenience to the vehicle's occupants[.]" *United States v. Nobel*, 762 F.3d 509, 521 (6th Cir. 2014) (citation omitted). A traffic stop, like an investigatory stop, must be "limited in [both] scope and duration." *Lott*, 954 F.3d at 923 (citation omitted and alteration in original) (observing that a traffic stop is analyzed like a *Terry* stop); *see also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (finding that the length of the traffic stop must not extend beyond the time needed to perform the tasks associated with it); *United States v. Lang*, No. 22-35-DLB-CJS, 2023 WL 358242, at *5–7 (E.D. Ky. Jan. 23, 2023)

(finding that removal of passenger from vehicle for reason other than officer safety exceeded the scope of a traffic stop). The officer can permissibly extend the length or enlarge the scope of a traffic stop "if 'something happen[s] *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'" *Lott*, 954 F.3d at 923 (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)).

Here, Defendant does not challenge the duration of his detention [Doc. 72 p. 21]. Instead, he asserts that within eighty-one seconds of stopping the vehicle, the officers surrounded the Jeep with guns drawn, required him to place his hands outside the vehicle, ordered him out of the Jeep, and immediately restrained him in handcuffs [*Id.* at 20–21]. He maintains that this degree of force exceeded the scope of an ordinary traffic stop and amounted to an arrest [*Id.*].

"[T]here is no bright line that distinguishes an investigative detention from an arrest." *United States v. Lopez-Arias*, 344 F.3d 623, 628 (6th Cir. 2003) (citation omitted). Although an individual subject to a traffic stop is not free to leave, he or she is not typically physically restrained. *See Noble*, 762 F.3d at 521. "To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *Lopez-Arias*, 344 F.3d at 627 (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). An officer may frisk a driver if he or she has reasonable suspicion that the person may be armed and dangerous. *Noble*, 762 F.3d at 521 (citing *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Reasonable suspicion to frisk is an objective standard, and it exists if, based upon the totality of the circumstances "a

reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger[.]'" *Id.* at 521–22 (quoting *Terry*, 392 U.S. at 27).

The amount of force used to detain an individual must be "reasonably related" to the reason for the stop, here a traffic violation, or the investigatory detention "ripens into an arrest" requiring probable cause. *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citation omitted). "'[T]he use of guns, handcuffs, and detention in a police cruiser do not automatically transform a *Terry* stop into an arrest, [but] these displays of force must be warranted by the circumstances.'" *Id.* at 415 (quoting *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006)) (alterations in original). "Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Id.*; *see also United States v. Biggs*, No. 3:22-cr-00224, 2023 WL 351204, at *4 (M.D. Tenn. Jan. 20, 2023) ("'Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest. . . . when circumstances do not warrant the precaution." (citation omitted)). "These 'specific facts' can include information supporting 'a reasonable belief that the suspect is armed and dangerous.'" *United States v. McElrath*, 786 F. App'x 575, 581–82 (6th Cir. 2019) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 835 (6th Cir. 2005)); *see also Biggs*, 2023 WL 351204, at *4 ("In considering whether the use of handcuffs is reasonable, the relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." (citation omitted)).

Circumstances justifying the restraint of a detained individual in handcuffs include the agitated detainee's admission that he or she possesses a weapon, the detainee's display of aggressive behavior during the stop, or the detainee's prior attempted flight. *Brown*,

26

779 F.3d at 415 (collecting cases); *see also United States v. Rutherford*, No. 3:19-CR-126-PLR, 2020 WL 4193471, at *5 (E.D. Tenn. July 21, 2020) (determining defendant's statement that he had a gun inside his vehicle, then reaching toward the vehicle justified officer's restraint of the defendant in handcuffs). Additionally, "[t]he details of the suspected crime may also provide the specific facts justifying an inference of dangerousness." *Brown*, 779 F.3d at 415; *see, e.g.*, *McElrath*, 786 F. App'x at 582 (officers conducting night-time raid reasonably drew their weapons and handcuffed persons associated with property from which they had received complaints of drug activity and shots fired, where informants previously observed guns and armed occupants, and after a vehicle hit their patrol car and fled); *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007) (police responding to 911 call that individual attempted to shoot a relative stopped the detainee at gunpoint and handcuffed him); *Atchley*, 474 F.3d at 849 (report of methamphetamine manufacturing plus defendant's nervous behavior and officer's experience justified handcuffing defendant during *Terry* stop); *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir. 1999) (police responding to report that individual shot police officer stopped the detainee at gunpoint and handcuffed him).

Defendant asserts that at the time he was removed from the vehicle at gunpoint and handcuffed, the officers lacked specific facts that would cause them to believe he posed a risk of flight or danger to the officers [*Id*. at 21]. As analyzed above, the description of possible drug possession or drug trafficking in the anonymous tip did not provide reasonable suspicion for an investigatory detention. Nor does suspicion of drug trafficking without more warrant the detention of the suspect in handcuffs. *See Noble*, 762 F.3d at 523 (holding passenger's presence in vehicle with others suspected of drug trafficking was not sufficient for a frisk when passenger, although nervous, was compliant and not threatening). The occupants of the Jeep were compliant

27

with the stop and the officer's directions to place their hands out of the windows and for Defendant to drop an item he was holding. The only information indicating a potential danger to the officers is the tip's report that the black male was armed and the Camry's earlier flight from police. But in the absence of any corroboration that the occupants of the Jeep stopped for speeding were engaged in drug trafficking, the Court finds the officers lacked specific facts to infer Defendant or anyone else in the Jeep presented a danger. *See Nobel*, 762 F.3d at 524 n.12 (noting the importance of the vehicle being stopped for traffic violations, not drug trafficking).

Defendant's detention "ripened into an arrest" after officers' surrounded the Jeep with guns drawn, ordered Defendant out of the vehicle at gunpoint, and immediately handcuffed him without specific facts indicating that he was armed and dangerous. This "warrantless arrest is constitutionally valid if, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [Defendant] had committed or was committing an offense." *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (internal quotations omitted and alteration in original)). As discussed above, at the time the officers stopped the Jeep, they lacked reasonable suspicion, much less probable cause, to believe Defendant (or another person in the Jeep) was engaged or had engaged in criminal activity.

Accordingly, Defendant's warrantless arrest violated his rights under the Fourth Amendment.

### C.    Exclusionary Rule

Defendant argues that all evidence gained by the officers in the wake of his illegal arrest, including the evidence seized from the vehicle pursuant to the dog alert, "must be suppressed as

28

the fruit of the poisonous tree" [Doc. 74 p. 4; *see* Doc. 72 pp. 12, 23]. For the reasons explained below, the "the fruit of the poisonous tree" doctrine does not apply to suppress the evidence seized from the search of the Jeep. Instead, the evidence seized from the Jeep resulted from the independent and lawful alert by the drug detection dog.[8] But the currency seized from Defendant's person should be suppressed.

The exclusion of evidence for a Fourth Amendment violation is not a right, but instead, the exclusionary rule is employed "only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)) (alteration in original). This "deterrence rationale limits the reach of the [exclusionary] rule" to circumstances in which the illegality causes the discovery of evidence. *Biggs*, 2023 WL 351204, at *5 (citation omitted). Accordingly, "[t]o trigger the exclusionary rule, the police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "'Th[e] exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure.'" *United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (citation omitted)). "The exclusionary rule forbids the government from using evidence caused by an illegal seizure, not evidence found around the time of a seizure." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011). Thus, "in the absence of any cognizable claim that the disputed evidence was the 'product' of illegal conduct the exclusionary rule does not apply." *Id*.

The Sixth Circuit has declined to apply the exclusionary rule to evidence seized from a vehicle that was lawfully stopped and searched, even if the detention of the vehicle's occupant

---

[8] Defendant does not challenge the dog alert or that it provided probable cause to search the Jeep [Doc. 74 p. 3].

was an illegal arrest. In *United States v. Howard*, the officers removed the defendant, whom they suspected was involved in drug trafficking, from a parked vehicle, frisked him, handcuffed him, and detained him in an office. 621 F.3d 433, 439–40 (6th Cir. 2010). Following an alert by a trained drug detection dog, officers searched his vehicle and seized a shoebox containing cash. *Id*. Although the forceful way in which officers detained the defendant amounted to an arrest, "the officers' display of authority and use of force to detain him did not create the circumstances that led to [the dog sniff of defendant's vehicle]." *Id*. at 453. Instead, the officer who called the K-9 team to the scene was not involved in the defendant's arrest or questioning and the dog sniff was "entirely independent" of defendant's arrest. *Id*. Similarly, in *United States v. Garcia*, the Court determined that "[s]o long as the officers acted properly in stopping the vehicle and executing the canine sniff, the resulting search warrant [for the vehicle] was not tainted by a prior illegality [of defendant's arrest without probable cause]." *United States v. Garcia*, 496 F.3d 495, 503 (6th Cir. 2007). And likewise, in *United States v. Bentley*, the Court affirmed the seizure of a gun from the vehicle pursuant to the plain view doctrine, despite the defendant's "premature arrest" when police stopped the defendant's vehicle by blocking it with unmarked police vehicles; surrounded the vehicle with guns drawn; and removed, frisked, handcuffed the defendant and his passenger before placing them in a marked patrol car. 29 F.3d at 1075–76. The Court declined to suppress evidence seized from defendant's car, finding the car was lawfully stopped and defendant's "premature arrest played no role in the seizing of the evidence from [his vehicle]." *Id*. at 1076.

In contrast, the Middle District of Tennessee found that an independent basis for the seizure of evidence from a defendant's vehicle was not clear when the officer saw scales inside

the vehicle after removing and handcuffing the defendant. *Biggs*, 2023 WL 351204, at \*6. It explained:

> Here, it is impossible to know with certainty whether, but for the unlawful arrest, [the officer] would have seen the digital scale on the driver's seat. [The officer] observed the digital scale on the driver's seat when he was placing the cell phone in the car after it had fallen on the ground. Perhaps if he had not been immediately handcuffed, [defendant] would not have dropped his cell phone or would have closed the car door. Perhaps but for the arrest, the digital scale and backpack would not have been in plain view.

*Id*. The court suppressed the items inside the vehicle because the discovery of those items was linked to the illegal arrest. *Id*. (also holding that the scales and backpack did not provide probable cause to search).

The fact pattern here is more like *Howard*, *Garcia*, and *Bentley*. The Jeep in which Defendant was a passenger was properly stopped due to a traffic violation [*See supra* Section A.2]. Officer Marlow and his drug detection dog arrived on the scene immediately behind Sergeant Tyner. Although Officer Marlow assisted in surrounding the Jeep at gunpoint, his participation in the detention of the Jeep's occupants did not lead to the discovery of any evidence. Instead, Officer Marlow left the detention of the occupants to the other officers, retrieved his drug detection dog, and led his dog around the Jeep. The dog made a positive alert. The evidence seized from the Jeep therefore was the result of the lawful stop and dog alert, which constitutes a basis for the discovery of the evidence seized from the Jeep independent from Defendant's unconstitutional arrest.

Accordingly, the evidence seized from the Jeep is not the fruit of Defendant's arrest. Only the currency seized from Defendant's person should be suppressed.

31

## IV.    CONCLUSION

Law enforcement properly stopped Defendant for a traffic violation and lawfully searched the Jeep and seized evidence therefrom pursuant to a dog alert. But Defendant's detention at gunpoint and in handcuffs was an arrest without probable cause, and the currency seized from Defendant's person as a result of that illegal arrest should be suppressed.

For all of the reasons explained herein, the undersigned respectfully **RECOMMENDS** that the District Judge **GRANT in part** Defendant Tarius Myers's Motion to Suppress All Evidence Following May 10, 2022 Traffic Stop [**Doc. 56**] and **SUPPRESS** the currency seized from Defendant Myers's person.[9]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide de novo review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

32