UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No.: 3:23-cr-87-TAV-JEM-2 ) |
| TARIUS S. MYERS, SR, | ) ) |
| Defendant. | ) ) |

### MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation ("R&R") entered by United States Magistrate Judge Jill E. McCook on April 24, 2024 [Doc. 75]. The R&R addresses defendant's motion to suppress [Doc. 56]. The government responded [Doc. 62], and Judge McCook held a motion hearing on February 27, 2024 [Doc. 66]. Judge McCook then issued the R&R [Doc. 75], recommending that the Court grant in part defendant's motion to suppress [Doc. 56].

Both the government and defendant filed objections to the R&R [Docs. 81, 82], and each party has responded to the other's objections [Docs. 82, 94]. Accordingly, the matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons that follow, the Court will **OVERRULE** defendant's objections [Doc. 82] and the government's objections [Doc. 81], **ACCEPT** and **ADOPT** the R&R [Doc. 75] in whole, and **GRANT in part** defendant's motion to suppress [Doc. 56].

I.   **Background**[1]

Defendant is charged, along with three named codefendants and unnamed others, with conspiring to distribute fentanyl (Count One) [Doc. 3, p. 1]. He is also charged with conspiring to distribute methamphetamine (Count Two) and fentanyl (Count Three) [*Id.* at 2–3]. Finally, he is charged with possessing a firearm in furtherance of drug trafficking crime (Count Four) [*Id.*].

The parties appeared before Judge McCook for an evidentiary hearing on defendant's motion to suppress on February 27, 2024 [Doc. 66]. The government presented the testimony of FBI Task Force Officer Steffan Hollifield of the Sevier County Sheriff's Office ("SCSO"), who is a lieutenant in the SCSO Narcotics, Organized Violent Crime, Apprehension ("NOVA") unit.

Around 7:00 a.m. on May 10, 2022, TFO Hollifield of the SCSO NOVA unit received a tip submitted on the SCSO's website by an individual purportedly staying at the Park Vista hotel. The author, who gave a name but did not provide a telephone number or other contact information, reported that the occupants of room 1314, which was the room next to his, had multiple visitors and were noisy. The author related that after complaining about the noise to hotel staff to no avail, he knocked on the door of room 1314 to talk to the occupants. According to the tip, a heavy-set white female answered the door, and the author could see a tall black male with shoulder-length dyed dreadlocks sitting at the desk

---

[1] The Court presumes familiarity with the facts and procedural posture of this case. The Court will adopt Judge McCook's factual findings [Doc. 75, pp. 12–14], as the parties have not objected to the background and evidence basis in the R&R.

inside the room. The author reported that the black male was armed and removing bags containing a tan powder from a portable safe. The author further reported that the occupants of room 1314 had a white Jeep Compass and a black Toyota Camry with dark-tinted windows.

In response to the tip, TFO Hollifield and four other officers from the NOVA unit arrived at the Park Vista hotel around 9:00 or 9:30 a.m. to conduct surveillance. Two officers were positioned in the hotel parking lot, where they observed a black Toyota Camry and a white Jeep Compass. Officer Hollifield was stationed at the bottom of the hill where the Park Vista's driveway connects to the Parkway, and two other officers were positioned further down the Parkway. The officers communicated over a private radio channel that was not recorded. The officers observed the black Toyota Camry leave the hotel parking lot and attempted to stop it, but the Camry fled. The officers determined that the occupants of room 1314 were scheduled to check out that day and that checkout time was 11:00 a.m. Around 11:30 a.m., officers in the parking lot observed a white female and a black male with shoulder-length blonde braids leave the hotel carrying luggage, enter the Jeep Compass, and leave the parking lot.

TFO Hollifield, who was in an unmarked pickup truck, followed the Jeep on the Parkway for three and one-half miles through seven traffic lights. During this time, he paced the Jeep and determined it was traveling at 49 miles per hour in a 35-mile-per-hour zone. TFO Hollifield radioed the other officers on the private channel that the Jeep was speeding and that it was going 49 miles per hour. TFO Hollifield and several other

3

Case 3:23-cr-00087-TAV-JEM   Document 97   Filed 08/12/24   Page 3 of 16   PageID #: 409

undercover officers followed the Jeep onto Wears Valley Road while Sergeant Bart Tyner and K-9 Officer Timothy Marlow traveled behind them but out of view in marked patrol cars. Based on the report of narcotics from the tip, Officer Marlow was present to deploy his drug-detection dog [Doc. 75, p. 5 (citing Doc. 68, p. 22)]. The officers coordinated the stop of the Jeep over the private radio channel. Around noon, the officers stopped the Jeep by boxing it against the curb with undercover officers in front and to the left of the Jeep and Sergeant Tyner in a marked patrol car behind the Jeep.

Four officers surrounded the Jeep with their guns drawn. Sergeant Tyner instructed defendant, who was in the front passenger seat, to place his hands outside the open window against the door. Defendant was removed from the Jeep and handcuffed within one and one-half minutes of the stop. After the occupants were out of the Jeep, Sergeant Tyner informed the driver that they stopped her for traveling at 49 miles per hour in a 35-mile-per-hour zone. Sergeant Tyner then gathered the driver's name, birthdate, and driver's license number and radioed this information to the dispatcher. While Sergeant Tyner spoke with the driver and defendant stood on the sidewalk in handcuffs with another officer, Officer Marlow deployed his drug-detection dog around the Jeep, and the dog alerted. An officer frisked defendant, removed a large roll of currency from defendant's pocket, and then placed defendant in the back of a patrol car. The officers searched the Jeep and seized narcotics, currency, a portable safe, scales, and a handgun from the vehicle.

Following the suppression hearing, defendant submitted a post-hearing brief [Doc. 72], to which the government responded [Doc. 73], and defendant replied [Doc. 74].

4

In support of his motion to suppress, defendant argued that officers violated his rights under the Fourth Amendment because they lacked both probable cause and reasonable suspicion to stop the Jeep [Doc. 72, pp. 1–2, 6–8]. He also argued that his detention on the scene, which occurred prior to the dog sniff, constituted an arrest without probable cause [Doc. 56, p. 3; Doc. 72, pp. 19–20; Doc. 74, pp. 2–4]. He further asserted that officers were not in a lawful position to use the drug-detection dog [Doc. 74, p. 3]. Finally, defendant argued that all evidence seized in the wake of his illegal arrest, including the evidence seized from the Jeep pursuant to the dog alert, must be suppressed under the fruit of the poisonous tree doctrine [*Id.* at 4; Doc. 72, pp. 12, 23].

Judge McCook then issued the R&R [Doc. 75], recommending that the Court grant in part defendant's motion [Doc. 56]. She concluded that the officers lacked reasonable suspicion to conduct an investigatory stop but had probable cause to stop the Jeep for a traffic violation [Doc. 75, p. 15]. She then determined that officers lacked reasonable suspicion, much less probable cause, to believe defendant was engaged in criminal activity and that his warrantless arrest violated his Fourth Amendment rights [*Id.* at 28]. Finally, Judge McCook concluded that, under the exclusionary rule, the evidence seized from the Jeep as a result of the dog sniff was not fruit of the poisonous tree—i.e., defendant's unlawful arrest—and only the currency seized from defendant's person should be suppressed [*Id.* at 31].

## II. Standard of Review

The Court reviews *de novo* those portions of the R&R to which a defendant has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers the R&R, the motion to suppress, the parties' underlying and supporting briefs, and their objections and responses to such objections, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review warrants a different result on a particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

## III. Analysis

### A. The Government's Objection

The government asks the Court to apply the inevitable discovery doctrine to find that the currency seized from defendant's person is admissible [Doc. 81, p. 2]. The government acknowledges that it failed to present argument about the applicability of the inevitable discovery doctrine in the R&R process, both in response to defendant's suppression motion and in its post-hearing brief [*Id.* at 2]. Nevertheless, the government submits that the preponderance of the evidence shows that, had defendant not been

6

unlawfully arrested, he "would have likely stood handcuffed" or unhandcuffed away from the Jeep while officers searched the vehicle, after which point he would have been lawfully arrested and searched incident to the arrest [*Id.* at 2–4].

In response, defendant observes that the government failed to offer proof on this issue at the suppression hearing and did not raise this claim either in response to defendant's motion or in its post-hearing briefing [Doc. 82, p. 4]. He further disagrees with the government's account of what it posits would have happened but for defendant's illegal arrest [*Id.*].

It is well established that issues raised for the first time in objections to an R&R may be deemed waived. *Uduko v. Cozzens*, 975 F. Supp. 2d 750, 757 (E.D. Mich. 2013) (citing *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) ("[I]ssues raised for the first time in objections to Magistrate Judge's report and recommendation are deemed waived.")). *See also United States v. Hayes*, 458 F. Supp. 3d 857, 869 (E.D. Tenn. 2020) ("When an argument is not presented to a magistrate judge, the district court may exercise its discretion to hold that the argument is forfeited."); *Reed v. Swanson*, No. 21-CV-11392, 2022 WL 4598501, at *6 (E.D. Mich. Sept. 30, 2022) (collecting cases). "'[W]hile the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate.'" *Smith v. CEVA Logistics U.S. Inc.*, No. 3:19-cv-913, 2021 WL 516280, at *3 (M.D. Tenn. Feb. 11, 2021) (quoting *Murr*, 200 F.3d at 902 n.1).

7

The government has offered no explanation or presented any compelling reason as to why it failed to raise this argument during the R&R process, despite having ample opportunity to do so. Further, "the Court agrees with the reasoning of other courts that allowing a party to raise an argument for the first time in an objection to an R&R defeats the purpose of the R&R process and frustrates judicial efficiency." *See Hayes*, 458 F. Supp. 3d at 869 (collecting cases) (quotations omitted). Consequently, the Court will treat the government's inevitable discovery argument as waived and accept Judge McCook's recommendation that the currency seized from defendant's person be suppressed.[2]

B.  **Defendant's Objection**

Defendant objects to Judge McCook's recommendation that the fruit of the poisonous tree doctrine should not apply to suppress the evidence seized from the Jeep [Doc. 82, p. 2; Doc. 75, pp. 29–30]. Judge McCook determined that the discovery of the evidence seized from the Jeep was the result of the lawful traffic stop and dog alert, not defendant's unlawful arrest [Doc. 75, p. 31].

The gist of the first part of defendant's argument appears to be that officers impermissibly detained the occupants of the Jeep beyond the scope of the traffic stop to conduct the dog sniff [Doc. 82, p. 2 (arguing that the government failed to prove that

---

[2] Even if the government did not waive such argument, it fails to point to any proof in the record that would support its assertion that defendant "would have likely stood either handcuffed or away from the vehicle search uncuffed" had he not been unlawfully arrested to carry its burden under the inevitable discovery doctrine [Doc. 81, p. 4].

8

officers had legal justification to detain him beyond the scope of the traffic stop)]. Defendant also maintains that officers were not in a lawful position to conduct the dog sniff [*Compare id. with* Doc. 74, p. 3]. He further argues that "there is no separation from the taint of the unlawful seizure and the subsequent search of the Jeep" based on Judge McCook's finding that officers lacked reasonable suspicion for an investigatory detention [Doc. 82, p. 2].

Accordingly, the relevant questions are whether the dog sniff and contraband seized from the Jeep were a result of the lawful traffic stop or defendant's unlawful arrest and, if the answer is the former, whether the dog sniff impermissibly prolonged the traffic stop.

Under the "fruit of the poisonous tree" doctrine, which supplements the exclusionary rule, only those pieces of evidence—the fruits—which derive from the constitutional violation—the poisonous tree, or here, defendant's unlawful arrest—should be suppressed. *See United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008). To exclude evidence under this doctrine, "the defendant must show more than 'the mere fact that a constitutional violation was a "but-for" cause of [the police's] obtaining [the] evidence.'" *Id.* (alterations in original) (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). Rather, "'the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Hudson*, 547 U.S. at 592). Therefore, when a dog sniff is performed as the result of the exploitation of a primary illegality, as opposed

9

to "means sufficiently distinguishable to be purged of the primary taint," the evidence discovered as a result of the dog sniff must be suppressed. *United States v. Buchanon*, 72 F.3d 1217, 1226 (6th Cir. 1995) (citation and quotations omitted).

Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]," such a seizure is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Here, defendant does not object to Judge McCook's conclusion that the traffic stop was lawful or that officers had probable cause to stop the Jeep for a traffic violation [Doc. 82, p. 3; Doc. 75, p. 24].

Nevertheless, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In particular, a lawful traffic stop must be limited in scope and duration. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver," as was the case here, "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407. The mission in the traffic-stop context is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed[;]" whichever comes first. *Id.* Aside from determining whether to issue a traffic ticket, "ordinary inquiries incident to the traffic stop"

10

that do not impermissibly extend the scope or duration of a stop include "checking the driver's license [and] determining whether there are outstanding warrants against the driver." *Id.* at 355–56 (cleaned up).

A dog sniff "is not fairly characterized as part of the officer's traffic mission" because it is a crime detecting action not ordinarily relevant to a traffic stop. *Id.* at 354–56. As a result, if an officer prolongs a traffic stop after completing the mission of the stop to have a drug-detection dog sniff a car, the officer must have independent reasonable suspicion to continue the stop. *Id.* at 354–55. *See also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) ("[S]ummoning a drug dog to sniff a stopped car is permissible as long as it does not 'improperly extend the length of the stop[.]'") (quoting *United States v. Bell*, 555 F.3d 535, 539, 541 (6th Cir. 2009)). But, officers do not need reasonable suspicion to conduct a dog sniff during a traffic stop so long as it occurs before completion of the stop's purpose, *see United States v. Betts*, 806 F. App'x 426, 429 (6th Cir. 2020), and indication of contraband from the dog sniff would then justify a search of the vehicle. *Id.* Put another way, officers may lawfully use a drug-detection dog during a traffic stop, even though they lack reasonable suspicion for an investigatory detention, to investigate crimes unrelated to the traffic violation, as long as the dog sniff does not impermissibly prolong the stop. *See id. See also Rodriguez*, 575 U.S. at 354–55 ("[W]e concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.").

The Court agrees with Judge McCook's conclusion that evidence seized from the Jeep was the result of the lawful traffic stop, not defendant's illegal arrest. Based on the proof presented at the suppression hearing, Judge McCook found the following:

> Officer Marlow and his drug detection dog arrived on the scene immediately behind Sergeant Tyner. Although Officer Marlow assisted in surrounding the Jeep at gunpoint, his participation in the detention of the Jeep's occupants did not lead to the discovery of any evidence. Instead, Officer Marlow left the detention of the occupants to the other officers, retrieved his drug detection dog, and led his dog around the Jeep. The dog made a positive alert.

[Doc. 75, p. 31]. Although defendant was unlawfully arrested during the lawful traffic stop, the evidence shows that his arrest did not contribute to or lead to the decision to deploy the drug-detection dog or the discovery of contraband from the Jeep. In particular, officers initially followed the Jeep to monitor for a traffic violation and were attempting to corroborate the report of narcotics from the tip [*Id.* at 6, 9]. Because of the tip, K-9 Officer Marlow assisted the other officers before defendant's unlawful arrest in monitoring the Jeep, and he was present to deploy his drug-detection dog during the traffic stop to help investigate the information provided in the tip [*Id.* at 5, 8 (citing Doc. 68, pp. 22, 48)].[3] Although defendant was arrested just before Officer Marlow deployed his drug-detection dog, Officer Marlow was not involved in defendant's arrest beyond assisting officers in

---

[3] Defendant argues that there is no separation from the taint of his illegal arrest and the search of the Jeep in light of Judge McCook's determination that the tip did not provide reasonable suspicion for an investigatory detention [Doc. 82, p. 2]. But, as explained further below, officers lacking reasonable suspicion sufficient for an investigatory detention may properly conduct a dog sniff during an otherwise lawful traffic stop, so long as the sniff does not unnecessarily prolong the stop. Accordingly, it is immaterial that officers conducted the sniff based on a tip that was deemed not reliable enough to justify an investigatory detention, because, as discussed further below, the sniff did not prolong the traffic stop.

12

stopping the Jeep and surrounding it at gunpoint [*Id.* at 31]. *See United States v. Howard*, 621 F.3d 433, 452–53 (6th Cir. 2010) (declining to apply the exclusionary rule where the officer who oversaw the dog sniff did not participate in the defendant's unlawful arrest, rending the dog sniff and resulting contraband "entirely independent" of the arrest). And regardless, as Judge McCook noted, officers did not gain any information or advantage from defendant's unlawful arrest that might have given them a separate basis to conduct the dog sniff and discover the contraband from the Jeep. Put differently, it cannot be said that officers exploited defendant's unlawful arrest to discover the contraband in the Jeep. *See Pearce*, 531 F.3d at 381.

Defendant does not object to the factual findings in the R&R, nor does he point to other proof in the record that indicates that his unlawful arrest "contributed to or in any way tainted the" contraband seized from the Jeep [*See* Doc. 82]. *See United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). Rather, the evidence shows that the tip and lawful traffic stop were the means that justified the presence and use of the drug-detection dog, which led to the discovery of the contraband defendant wishes to suppress. Such means were separate and sufficiently distinguishable from defendant's illegal arrest. *See id.*

The record further indicates that the dog sniff did not improperly extend the scope or duration of the traffic stop. Sergeant Tyner's body camera video shows that Officer Marlow oversaw the dog sniff while Sergeant Tyner carried out the mission of the traffic stop: Sergeant Tyner spoke with the driver, informed her of the reason for the stop, gathered

13

her name, date of birth, and driver's license number, radioed this information to the dispatcher, and prepared to write a citation for speeding [Doc. 75, p. 11 (citing Exh. 2 at 12:04:00–12:06:20)]. Sergeant Tyner's actions in detaining the driver were consistent with "ordinary inquiries incident to the traffic stop," and defendant does not argue otherwise. *See Rodriguez*, 575 U.S. at 354–55. And before Sergeant Tyner was able to write a citation, thereby completing the mission of the stop, the dog alerted. *Compare id.* (involving a traffic stop that was prolonged for a dog sniff *after* the traffic citation had been issued). This demonstrates that the dog sniff did not improperly prolong the traffic stop. Therefore, contrary to defendant's position [Doc. 82, p. 2], officers were in fact in a lawful position to conduct the dog sniff even though they lacked reasonable suspicion for an investigatory detention because the sniff did not impermissibly extend the stop. *See Betts*, 806 F. App'x at 429 (explaining that officers do not need reasonable suspicion to use a drug-detection dog during a lawful traffic stop so long as the sniff occurs before the mission of the stop is complete).

Judge McCook further reasoned that the circumstances here are similar to those in *United States v. Howard*, 621 F.3d 433 (6th Cir. 2010), *Garcia*, 496 F.3d at 503, and *United States v. Bentley*, 29 F.3d 1073 (6th Cir. 1994) [Doc. 75, pp. 30–31]. In those cases, the defendants were unlawfully arrested during otherwise lawful investigatory stops, and officers subsequently discovered certain contraband, which the defendants wished to suppress under the fruit of the poisonous tree doctrine. *Howard*, 621 F.3d at 452–53; *Garcia*, 496 F.3d at 503; *Bentley*, 29 F.3d at 1075–76. The Sixth Circuit rejected the

14

defendants' positions and determined that officers had some independent basis for discovering the contraband, separate from the unlawful arrests, and that their arrests did not contribute to the discovery of such contraband. *See id.*

Defendant attempts to distinguish those cases [Doc. 82, pp. 2–3], observing that, unlike here, those officers were found to have had reasonable suspicion that the defendants were involved in illegal activity, and in *Howard* and *Garcia*, conducted dog sniffs based on such reasonable suspicion. *Howard*, 621 F.3d at 452–53; *Garcia*, 496 F.3d at 503

Here, that officers lacked reasonable suspicion for an investigatory detention is of little import. This is because officers had probable cause to stop the Jeep based on a traffic violation for as long as it reasonably took to carry out the stop's mission [Doc. 75, pp. 19, 24]. Although defendant argues otherwise [Doc. 82, pp. 2–3], officers did not need reasonable suspicion to conduct the dog sniff, which was properly performed before the stop's purpose was complete. *See Rodriguez*, 575 U.S. at 354–55. And, as explained above, the evidence shows that defendant's unlawful arrest did not create the circumstances that led to the dog sniff or the discovery of the contraband from the Jeep. *See Howard*, 621 F.3d at 452–53. Nor did his arrest cause or contribute to the decision to conduct a dog sniff or lead officers to discover the evidence from the Jeep. Rather, based on the tip, Officer Marlow was present with his drug-detection dog, participated in the officers' investigatory efforts long before defendant's unlawful arrest, and properly conducted the dog sniff in the context of the lawful traffic stop. There is no evidence that officers exploited defendant's unlawful arrest in conducting the sniff or in discovering the

15

evidence from the Jeep, and defendant has not otherwise shown the discovery of such contraband was the fruit from his unlawful arrest. *See Garcia*, 496 F.3d at 503.

Having found that officers acted properly in stopping the Jeep and executing the dog sniff, the Court concludes that the resulting search of the Jeep was not tainted by defendant's unlawful arrest. *See id.* ("So long as the officers acted properly in stopping the vehicle and executing the canine sniff, the resulting search warrant was not tainted by a prior illegality.").

## IV. Conclusion

Accordingly, upon a careful and *de novo* review of the record and the law, the Court finds that the recommendations contained in the R&R are correct. Defendant's objections [Doc. 82] and the government's objections [Doc. 81] are **OVERRULED**. The Court **ACCEPTS in whole** the R&R [Doc. 75] and incorporates it into this Memorandum Opinion and Order. The Court hereby **GRANTS in part** defendant's motion to suppress [Doc. 56]. Because the evidence seized from the Jeep is not fruit of defendant's arrest, it is not suppressed. However, the currency seized from defendant's person is suppressed.

IT IS SO ORDERED.

s/ Thomas A. Varlan<br>
UNITED STATES DISTRICT JUDGE